Reuben D. Nathan, Esq. (SBN 208436)
**NATHAN & ASSOCIATES, APC**
2901 W. Coast Hwy., Suite 200
Newport Beach, CA 92663
Office: (949) 270-2798
Email: rnathan@nathanlawpractice.com

Ross Cornell, Esq. (SBN 210413)
**LAW OFFICES OF ROSS CORNELL, APC**
P.O. Box 1989 #305
Big Bear Lake, CA 92315
Office: (562) 612-1708
Email: rc@rosscornelllaw.com

Attorneys for Plaintiff, SITI AISHAH RIDZUAN

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SITI AISHAH RIDZUAN, on behalf of herself and all similarly situated persons,<br><br>Plaintiff,<br><br>v.<br><br>UNITED BUSINESS BANK, a California banking corporation,<br><br>Defendant. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>1) Cal. Penal Code § 631<br>2) 18 U.S.C. § 2511(1)(a)<br>3) Cal. Bus. & Prof. Code § 17200, *et seq.*<br>4) Cal. Constitution Art. I § 1<br>5) Intrusion Upon Seclusion<br>6) Unjust Enrichment |

Plaintiff SITI AISHAH RIDZUAN ("Plaintiff") files this class action complaint on behalf of herself and all others similarly situated (the "Class Members") against Defendant UNITED BUSINESS BANK, a California banking corporation, ("Defendant" or "United Business Bank"). Plaintiff brings this action based upon personal knowledge of the facts pertaining to herself, and on information and belief as to all others, by and through the investigation of undersigned counsel.

## I. NATURE OF THE ACTION

1. This is a class action lawsuit brought on behalf of all California residents who have accessed and used www.unitedbusinessbank.com (the "Website"), a website that Defendant provides for public access and use.

2. Plaintiff personally used the Website during the class period, including on August 11, 2026, and preserved an HTTP archive file, commonly known as a HAR file, of one of her own browsing sessions. A HAR file is a record of the network exchanges between a browser and the servers with which it communicates, including the requests the browser sends, the headers and parameters those requests carry, and the responses received.

3. Plaintiff's HAR file accordingly records the requests her browser transmitted to the Third Parties identified below during that session, including the named fields carrying the contents of her communications and the persistent identifiers transmitted with them. The figures reproduced below are from an independent technical investigation counsel commissioned, which replicated the URLs and user flows recorded in the HAR file, and are included as corroboration.

4. During her use of the Website, Plaintiff navigated to multiple pages on the Website, unaware that Defendant was causing and permitting third parties to intercept the contents of her communications and reveal the banking and financial subject matter she was reading about.

5. Defendant caused the interception of the contents of Plaintiff's communications with the Website, including the page addresses identifying what she

was browsing and the page titles identifying the subject matter of the pages she was reading, by causing each such communication to be duplicated and routed to the Third Parties over separate channels as part of the same page load. The page addresses were routed to both Third Parties. The page titles, and the words appearing on the links she selected, were routed to Mixpanel.

6. As set forth in the Specific Allegations section of this Complaint below, Defendant surreptitiously embeds and operates third-party tracking technologies on the Website that intercept the contents of users' electronic communications and transmit them without notice or consent. One of those third parties did not receive a bare address. It received a structured event in which the page the user was viewing had already been described in words, together with the words appearing on the link the user then selected, and the identifier by which that recipient recognizes the user across sessions. Defendant wrote the configuration under which that recipient's code operated and enlarged it beyond the recipient's own default.

7. Defendant deploys these interception technologies in violation of the California Invasion of Privacy Act, Cal. Penal Code § 631, and the Federal Wiretap Act, 18 U.S.C. § 2511(1)(a). Plaintiff directly observed the Website configured in this manner during her August 11, 2026 session, and it remains so configured. On information and belief, and subject to proof following discovery of Defendant's tag-management records and its agreements with the Third Parties, the Website was configured in this manner throughout the class period.

## II. GENERAL ALLEGATIONS

8. A pixel tracker, also known as a web beacon, is a tracking mechanism embedded in a website that monitors user interactions. It typically appears as a small, transparent 1x1 image or a lightweight JavaScript snippet that activates when a webpage is loaded, or a user performs a tracked action.

9. When triggered, the pixel causes the user's browser to transmit data to third-party servers, including the contents of the user's communications with the Website such

as page addresses identifying what the user is browsing, page titles identifying the subject matter of the page, the address from which the user arrived, session-level identifiers, and browser and device characteristics.

10. When users visit the Website, Defendant causes tracking technology to be embedded in visitors' browsers. These include, but are not limited to, the following:

- The Mixpanel Tracker
- The LinkedIn Tracker

11. The third parties who operate the above-listed trackers use the intercepted contents of users' communications collected via the Website for their own independent purposes, which go beyond Defendant's direct needs, for their own financial gain. Mixpanel uses them to identify individual users, to attribute their activity to them, and to make that activity available for analysis. LinkedIn uses them to match website visitors to their LinkedIn member accounts and to tally their actions for advertising purposes. The above-listed trackers are referred to herein collectively as the "Trackers" and their operators are referred to collectively as the "Third Parties."

12. The Trackers are operated by distinct third parties, namely Mixpanel, Inc. (as to the Mixpanel Tracker) and LinkedIn Corporation (as to the LinkedIn Tracker). Defendant knowingly embeds and deploys the Trackers on the Website and configures them to execute automatically within users' browsers upon page load. The Trackers' transmissions carry Defendant's own account identifiers with each Third Party. The Trackers are not resources users request and are not necessary to render the Website's content or functionality.

13. Defendant configured the Website so that the contents of each user's communication with the Website were duplicated into separate third-party transmissions. When a user's browser requested a page, code that Defendant embedded on the Website obtained the contents of that communication from the state of the browser for the page then being loaded, wrote those values into named fields of separate requests, and directed the browser to send those requests to servers the Third Parties control. Those

additional transmissions served no part of the user's request for the page. No user action was required and none of it was visible.

14. Plaintiff and the Class Members did not consent to the installation, execution, embedding, or injection of the Trackers on their devices and did not consent to the contents of their communications with the Website being intercepted by third parties. The Website did not display any consent banner, pop-up, cookie notice, or other authorization mechanism requesting permission before deploying the Trackers to intercept user communications. Defendant did not obtain express prior consent for the interception and transmission of the contents of users' communications for advertising, analytics, or monetization purposes.

15. Generalized references herein to users, visitors and consumers expressly include Plaintiff and the Class Members.

## III. PARTIES

16. Plaintiff SITI AISHAH RIDZUAN is a California citizen residing in Contra Costa County, California, and has an intent to remain there. Plaintiff was in California when she visited the Website, which occurred during the class period including but not limited to on August 11, 2026. The allegations set forth herein are based on the Website as configured when Plaintiff visited it.

17. Defendant UNITED BUSINESS BANK is a California banking corporation with its principal place of business in Walnut Creek, California, in Contra Costa County. Defendant owns, operates, and controls the Website. Through the Website, Defendant markets and offers consumer and commercial banking products and services, including deposit accounts, savings products, individual retirement accounts and health savings accounts.

18. Defendant owned, operated and controlled the Website at all times during the class period, and publicly identifies www.unitedbusinessbank.com as its own website.

19. Through the Website and its branch network, Defendant conducts banking

business in California and in other states.

## IV. JURISDICTION AND VENUE

20. Defendant is subject to the general personal jurisdiction of this Court. Defendant maintains its principal place of business in Walnut Creek, California. Defendant is therefore at home in this State, and this Court may exercise jurisdiction over it under Federal Rule of Civil Procedure 4(k)(1)(A) and Cal. Code Civ. Proc. § 410.10.

21. Plaintiff's claims also arise out of and relate to Defendant's conduct in this State. Plaintiff accessed the Website from California, and the interception of the contents of her communications occurred on her device in California, through Trackers that Defendant placed and configured on the Website.

22. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiff asserts a claim arising under federal law, specifically 18 U.S.C. § 2520, which provides a civil cause of action for violations of 18 U.S.C. § 2511(1)(a) of the Federal Wiretap Act.

23. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a) because those claims are so related to the federal claim that they form part of the same case or controversy under Article III of the United States Constitution.

24. Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2). Defendant maintains its principal place of business within this District and therefore resides here for venue purposes. In addition, a substantial part of the events giving rise to the claims occurred within this District, including Plaintiff's California-located use of the Website from her Contra Costa County residence and the execution of the Trackers on her device in this District.

## V. FEDERAL AND STATE PRIVACY LAWS

### 1. The California Invasion of Privacy Act (CIPA)

25. The California Invasion of Privacy Act (CIPA) is a legislative measure

designed to safeguard the privacy rights of California residents by prohibiting unauthorized wiretapping and eavesdropping on private communications. The California Legislature recognized the significant threat posed by emerging surveillance technologies, declaring that "the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society" (Cal. Penal Code § 630).

26. Despite predating the Internet, CIPA has been applied to email and other Internet communications so long as that application is consistent with the statutory text and purpose. Section 631(a) reaches the interception of email content and online communications and consent under CIPA must be obtained before the interception occurs.

27. CIPA's text and history confirm that the Legislature intended to protect core privacy rights, as reflected in § 630's declaration that the statute was enacted to protect the right of privacy of the people of this state. CIPA codifies a substantive right to privacy such that the violations of CIPA alleged herein, which implicate traditional interests in personal privacy, constitute concrete injuries sufficient to establish Article III standing. The communications intercepted here were not bare records of connection. They were the addresses of pages concerning individual retirement accounts, health savings accounts and personal savings, transmitted to two third parties, and the titles of those pages and the words appearing on the links Plaintiff selected, transmitted to one of them, each attached to a persistent identifier that recognizes the browser across sessions.

28. Individuals may pursue legal action against violators of Cal. Penal Code § 631 and are entitled to seek $5,000 in statutory penalties per violation. Cal. Penal Code § 637.2(a)(1).

**2. The Federal Wiretap Act**

29. The Federal Wiretap Act, enacted as Title III of the Omnibus Crime Control and Safe Streets Act of 1968 and amended by the Electronic Communications Privacy

Act (ECPA) of 1986, prohibits the intentional interception of wire, oral, or electronic communications. Congress enacted the statute to safeguard the privacy of communications against unauthorized interception, recognizing that unchecked surveillance technology poses a fundamental threat to individual liberty.

30. The Federal Wiretap Act applies to communications transmitted over the Internet. The 1986 ECPA amendments expressly extended the statute's protections to electronic communications as defined under 18 U.S.C. § 2510(12) to include "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce." That includes data transmitted over the internet such as the contents of web browsing activity via HTTP requests as alleged here.

31. A person whose electronic communications are intercepted in violation of 18 U.S.C. § 2511 may bring a civil action pursuant to 18 U.S.C. § 2520(a). Available relief includes the greater of actual damages or statutory damages of $100 per day for each day of violation or $10,000, whichever is greater, plus punitive damages in appropriate cases, reasonable attorney's fees, and other litigation costs reasonably incurred.

## VI. SPECIFIC ALLEGATIONS

32. During her use of the Website, Plaintiff navigated to the following pages, unaware that Defendant was causing and permitting the Third Parties to intercept the contents of her communications:

- https://www.unitedbusinessbank.com/personal/savings/individual-retirement-accounts-iras.html;
- https://www.unitedbusinessbank.com/personal/savings/health-savings-accounts.html; and
- https://www.unitedbusinessbank.com/personal/savings/personal-savings.html.

33. During those visits both Trackers described below operated on the Website, and each received the contents of Plaintiff's communications as to each of the pages identified above. Those requests carried no cookie header; the identifiers described below were instead carried in the outbound requests themselves.

**1. The Mixpanel Tracker**

34. Defendant embedded and configured on the Website an analytics tag operated by Mixpanel, Inc. Plaintiff's browser downloaded Mixpanel's JavaScript library from Mixpanel's content delivery network during her session, and the transmissions that followed carried Defendant's own Mixpanel project token. The tag is not a resource Plaintiff requested and is not necessary to render the Website's content.

35. Plaintiff's browser began loading each page from Defendant's servers. As part of that same page load, and without any further request or action by Plaintiff, the browser executed Mixpanel's code. That code obtained the address of the page then being loaded, the title of that page, and the path of that page from the state of the browser for that page, wrote those values into named fields of a new request, and directed Plaintiff's browser to send that request to Mixpanel.

36. The values Mixpanel received in those named fields, from Plaintiff's own session, included the full address of each of the pages identified above and the full title of each. Those titles were "Individual Retirement Accounts (IRAs) | United Business Bank | Serving California, Colorado, Nevada, New Mexico, & Washington," "Health Savings Accounts | United Business Bank | Serving California, Colorado, Nevada, New Mexico, & Washington," and "Personal Savings | United Business Bank | Serving California, Colorado, Nevada, New Mexico, & Washington."

37. Mixpanel states that its automatic capture is available for the web only through its JavaScript library, that it is turned on by a configuration setting in the snippet the website operator installs, and that if that setting is not present the feature is not enabled. Autocapture, Mixpanel Docs, https://docs.mixpanel.com/docs/tracking-methods/autocapture. Mixpanel further states that by default its automatic capture does

not capture the text a website displays, does not collect sensitive input fields, and takes only a limited set of HTML attribute values, and that it offers those defaults as a privacy-protective configuration. Autocapture, supra.

38. Defendant did not accept those defaults. The health savings accounts page and the personal savings page, as Defendant served them to Plaintiff's browser, each contain Defendant's own initialization of the Mixpanel library, written into the HTML of the page itself. That initialization names Defendant's Mixpanel project token and turns on automatic capture with an express instruction to capture the text content of page elements. The library Defendant loaded from Mixpanel ships with that instruction set to the opposite value. Defendant's initialization further directs the library to record a percentage of visitor sessions and to record heat-map data.

39. The same configuration governed the individual retirement accounts page. The transmissions from that page carried Defendant's project token, the page name Defendant had registered for it, and the text of the link Plaintiff selected on it.

40. That same initialization registers, as a value carried on the events that follow, a name Defendant itself assigns to each page in words. As the pages identified above were served, the names Defendant assigned were "INDIVIDUAL RETIREMENT ACCOUNTS IRAS," "HEALTH SAVINGS ACCOUNTS," and "PERSONAL SAVINGS." Defendant therefore did not merely permit a third party's code to run on its pages. Defendant wrote the configuration governing what that code collected, enlarged it beyond the recipient's own default, and supplied its own description of each page to be carried with the data.

41. Mixpanel describes the identifier as the means by which it determines who a visitor is. Mixpanel states that identity management is the process of assigning identifiers and maintaining identifier mappings so that data are attributed to users accurately, and that it uses the distinct identifier property to identify users and determine their uniqueness. Mixpanel states that the value of that property tells Mixpanel which user to attach an event to; that its purpose is to provide a single unified identifier for a

user across devices and sessions; that two events bearing the same value are considered to have been performed by one unique user; and that two events bearing different values are considered to have come from two separate users. Identity Management Overview, Mixpanel Docs, https://docs.mixpanel.com/docs/tracking-methods/id-management.

42. A persistent Mixpanel identifier was transmitted in named fields of each of those same requests, and it held a single value throughout Plaintiff's session. That same value was already present in the first-party storage on Plaintiff's browser before the first page of the session was requested, so it did not originate in the session in which Plaintiff was browsing. Mixpanel states that its JavaScript library generates that identifier automatically. Identity Management Overview, supra.

43. Counsel's investigator examined the storage the Website writes to a visitor's browser. The Mixpanel identifier was held there in a cookie set on Defendant's own domain, bearing an expiration approximately one year forward, and its value matched the value transmitted to Mixpanel.

44. Mixpanel describes what it does with what it receives. Mixpanel states that an event is a data point representing an interaction between a user and the product, and that on the other side of an event is a user, meaning the specific individual who completed that interaction. Mixpanel states that each user has a unique identifier used to track that user's activity and that Mixpanel uses a unique identifier to identify users. What is Mixpanel?, Mixpanel Docs, https://docs.mixpanel.com/docs/what-is-mixpanel. Mixpanel states that user profiles are joined to events on the basis of the distinct identifier. Types of Properties in Mixpanel, supra.

45. Mixpanel states that its Users page aggregates and organizes user profiles and facilitates a granular view into the behavior of individual users, that it may be used to count users based on behavior and to explore their unique history, and that selecting a user opens that user's unique history. Mixpanel states that the page may be set to display every user who has completed any event. Users, Mixpanel Docs, https://docs.mixpanel.com/docs/users.

46. Attributing a described page to an identifier that recognizes a visitor across sessions, and making that visitor's history available to be explored, are operations performed on the transmitted values. Neither can be performed without ascertaining what those values say. The title of a page is a description of that page in words, and it was transmitted in a field named for that purpose.

47. Mixpanel did not receive only the pages Plaintiff loaded. Mixpanel also received named events reporting that Plaintiff had scrolled a page, that she had clicked on a page, and that Mixpanel classified a click she made as a dead click, each carrying the address of the page on which it occurred and the same identifier. Mixpanel defines a dead click as a click on an interactive element that produces no visible response within a specified period, which Mixpanel sets by default at half a second. Autocapture, supra.

48. Those interaction events carried more than the fact of a click. Each carried, in a named field, the visible words of the link Plaintiff had selected, together with the address that link led to. As Plaintiff read the individual retirement accounts page, Mixpanel received the words "Health Savings Accounts" and the address of the health savings accounts page. As she read the health savings accounts page, Mixpanel received the words "Personal Accounts" and then the words "Personal Savings," each with the address of the page it led to. Mixpanel therefore received not only the subject matter Plaintiff was reading but the subject matter she reached for next, described in the words the Website displayed to her.

49. That configuration had a direct consequence for what Mixpanel received. Because Defendant instructed the library to capture the text content of page elements, the words appearing on the links Plaintiff selected were transmitted from her browser to Mixpanel in a named field of those events, notwithstanding that Mixpanel's own default is not to capture the text a website displays.

50. Mixpanel publishes the means by which a website operator may limit or prevent that collection. Mixpanel states that the automatic capture may be disabled in its JavaScript library; that a customer may confine collection to specified elements or

specified pages; that individual elements may be excluded by applying designated class names; and that entire addresses may be excluded by a blocking configuration. Autocapture, supra. Defendant applied none of these to the pages identified above.

51. Figures 1 through 3 are network captures of outbound requests to Mixpanel transmitted during the loads of the three pages identified above.

52. Figure 1 is the request transmitted as the individual retirement accounts page loaded. Carried within the body of that request, each in its own named field, are the full address of the page in human readable terms, its full title identifying individual retirement accounts, the path of the page, Defendant's project token, and the identifier by which Mixpanel recognizes Plaintiff's browser.

**Figure 1**




53. Figure 2 is the request transmitted as the health savings accounts page loaded. It carries the full address of that page and its full title identifying health savings accounts, in the same named fields and in human readable terms, under Defendant's project token.

/ / /

## Figure 2



54. Figure 3 is the request transmitted as the personal savings page loaded. It carries the full address of that page and its full title identifying personal savings, in the same named fields, in human readable terms, under Defendant's project token.

## Figure 3



55. Mixpanel, Inc. is not a party to the communications between Plaintiff and the Website. It operates a data analytics business of its own and has the capability to use

its record of these interactions for its own purposes. Defendant aided and abetted that interception by embedding and configuring the tag on the Website.

**2. The LinkedIn Tracker**

56. Defendant embedded and configured on the Website an advertising tag operated by LinkedIn Corporation, which LinkedIn brands the LinkedIn Insight Tag. Plaintiff's browser downloaded LinkedIn's insight library from LinkedIn's content delivery network during her session, and the transmissions that followed carried Defendant's own LinkedIn partner identifier. The tag is not a resource Plaintiff requested and is not necessary to render the Website's content.

57. As part of the same page load, and without any further request or action by Plaintiff, Plaintiff's browser executed LinkedIn's code. That code obtained the address of the page then being loaded from the state of the browser for that page, wrote it into a named parameter of a new request, and directed Plaintiff's browser to send that request to LinkedIn's advertising servers. The parameter carrying the address of the page is named for that purpose.

58. The values LinkedIn received in that named parameter, from Plaintiff's own session, were the full addresses of each of the pages identified above. A persistent LinkedIn advertising identifier was transmitted in a further named parameter of those same requests, and it held a single value across every one of them.

59. Counsel's investigator found that advertising identifier written into the local storage of Defendant's own website rather than set as a cookie, where it persisted independently of the browser's cookies and was not removed by clearing them. Its value matched the value transmitted to LinkedIn.

60. LinkedIn publishes documentation addressed to advertisers who install the Insight Tag, which is the integration Defendant deployed. LinkedIn states that the tag relies on LinkedIn cookies, which enable LinkedIn to match a website's visitors to their respective LinkedIn member accounts, and that once matched LinkedIn can tally their actions in its campaign management product so that the advertiser may analyze the

website's conversion flows and optimize its advertising campaigns. LinkedIn Insight Tag, LinkedIn, https://business.linkedin.com/advertise/ads/insight-tag.

61. LinkedIn further states that by default the Insight Tag tracks visits to the advertiser's website, including the address of the page, buttons clicked, the referring address, the Internet Protocol address, device and browser characteristics, and a timestamp, and that the library it downloads automatically records a page-load conversion each time it loads. LinkedIn Insight Tag, supra.

62. No parameter conveying an opt-out or a privacy preference accompanied any of the transmissions to either Third Party.

63. Matching a visitor to a member account, and tallying that visitor's actions on named pages of a website, are operations performed on the transmitted values. Neither can be performed without ascertaining what the transmitted address says and determining that it belongs with the identifier transmitted alongside it.

64. Figure 4 is a network capture of an outbound request to LinkedIn transmitted during the load of the individual retirement accounts page identified above. The full address of that page, Defendant's partner identifier and a LinkedIn advertising identifier are carried together, in plain text, within the address of the request itself.

**Figure 4**



65. LinkedIn Corporation is not a party to the communications between Plaintiff and the Website. It operates an advertising business of its own and has the capability to use its record of these interactions for its own purposes. Defendant aided and abetted that interception by embedding and configuring the tag on the Website.

**3. Defendant's Representations to Visitors**

66. Defendant published a California Consumer Privacy Act Notice at Collection of Personal Information, effective January 1, 2024, which was in effect when Plaintiff visited the Website.

67. In that Notice, immediately after listing the categories of personal information it collects and the purposes for which it uses them, Defendant represents that it does not sell personal information and does not share it for cross-context behavioral advertising.

68. Sharing for cross-context behavioral advertising is a defined term under the statute the Notice is given under. Defendant nonetheless caused the addresses of the pages Plaintiff was reading to be transmitted to LinkedIn, an advertising company, in requests addressed to LinkedIn's advertising servers, carrying Defendant's own advertising partner identifier and an advertising identifier assigned to Plaintiff's browser, by means of a tag that LinkedIn describes as serving the matching of visitors to member accounts and the optimization of advertising campaigns.

69. That Notice does not identify Mixpanel, Inc., LinkedIn Corporation, or any other analytics or advertising provider by name. Defendant's separate California Consumer Privacy Act policy refers to LinkedIn once, and does so only to describe social media as a source from which Defendant may obtain information about a consumer. Neither document discloses that Defendant transmits the addresses of the pages a visitor reads on the Website to LinkedIn, or that it transmits those addresses together with the titles of those pages and the words on the links the visitor selects to Mixpanel.

70. Plaintiff was therefore given no accurate description of the conduct alleged above before it occurred, and was affirmatively told that Defendant does not share

personal information for advertising directed across contexts.

**4. Interception While in Transit**

71. Two sets of code ran as part of Plaintiff's browser's single attempt to load each page identified above. The first was the Website's own code, which delivered the page Plaintiff had asked for. The second was the Trackers' code, which Plaintiff did not request and which served no part of her request for that page. Plaintiff communicated with Defendant's servers in order to obtain the content she was reading. She did not communicate with either Third Party for that purpose, or for any purpose of her own.

72. The Trackers did not obtain the contents of Plaintiff's communications from Defendant's stored records, and there was no separate transaction in which Defendant later furnished them. The values the Trackers transmitted were read from the state of the browser for the page then being loaded, and they identified that page and no other.

73. The Trackers acquired the contents of Plaintiff's communications at the point those contents existed in her browser as part of the page she had requested. The Trackers' code, executing within the load of that page, read the page's address and, in Mixpanel's case, the words describing that page, out of the state of the browser for that page, and held those values before composing and dispatching any request of its own. What that code obtained, it obtained from the communication itself.

74. Each of those transmissions was therefore initiated by the Trackers' own code, executing within the load of the page Plaintiff had requested, and the contents of those communications were acquired while in transit.

75. The duplication was not a single copy. As each of the pages identified above loaded, the address of that page was written into named fields of a separate request to Mixpanel and into a named parameter of a separate request to LinkedIn, and the words describing that page were in addition written into a named field of the request to Mixpanel. The contents of Plaintiff's communications with the Website were therefore replicated and routed to two commercial recipients over separate channels. Plaintiff did

not request content from either recipient, neither was a party to her communications with the Website, and neither was made known to her.

76. The transmission that accompanied each page load required no action by Plaintiff whatever. None of the transmissions described above was visible to Plaintiff, and she had no opportunity to see, review, prevent or object to any of them before it occurred. Plaintiff was given no indication that scrolling or clicking on a page would cause a further description of her activity to be transmitted to Mixpanel.

77. Defendant knew of this arrangement and constructed it. Defendant's own project token is carried on every Mixpanel transmission described above and Defendant's own partner identifier is carried on every LinkedIn transmission described above. Defendant obtained an account with each Third Party, deployed each Third Party's library on the Website, and configured that code to execute automatically when visitors load pages of the Website. As to Mixpanel, Defendant went further and configured the Website to write the words describing each page into a named field of the outbound transmission.

## VII. CLASS ALLEGATIONS

78. Plaintiff brings this action individually and on behalf of all others similarly situated (the "Class" or "Class Members") defined as follows:

> All persons within California whose electronic communications with the Website, including the URL contents of their HTTP requests to the Website, were intercepted by one or more of the Trackers, or by any other third party to which Defendant caused those contents to be transmitted, between August 11, 2025 and the present.

79. NUMEROSITY: Plaintiff does not know the number of Class Members but believes the number to be in the thousands, if not more. The exact identities of Class Members can be ascertained by the records maintained by Defendant.

80. COMMONALITY: Common questions of fact and law exist as to all Class Members and predominate over any questions affecting only individual members of the

Class. Such common legal and factual questions include but are not limited to:

- Whether Defendant configured the Website to transmit the URL contents of visitors' HTTP requests to both Trackers, and the titles of the pages they viewed and the words appearing on the links they selected additionally to Mixpanel;
- Whether the URL contents of those requests, and the titles of the pages visitors viewed, constitute "contents" of electronic communications within the meaning of Cal. Penal Code § 631(a) and 18 U.S.C. § 2510(8);
- Whether Defendant's conduct constitutes interception of electronic communications in violation of Cal. Penal Code § 631(a);
- Whether Defendant's conduct constitutes intentional interception of electronic communications in violation of 18 U.S.C. § 2511(1)(a);
- Whether Defendant's conduct constitutes an unlawful or unfair business practice under Cal. Bus. & Prof. Code § 17200;
- Whether Plaintiff and Class Members are entitled to statutory damages;
- Whether Class Members are entitled to injunctive relief;
- Whether the Defendant's conduct violates the California Constitution;
- Whether the Defendant's conduct constitutes an intrusion upon seclusion;
- Whether Class Members are entitled to restitution of benefits Defendant obtained through the challenged conduct; and
- Whether Class Members are entitled to restitution.

81. TYPICALITY: As a person who visited the Website and whose URL contents and page titles were intercepted as alleged above, Plaintiff is asserting claims that are typical of the Class Members. Plaintiff's experience with the Trackers is typical to Class Members.

82. ADEQUACY: Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained attorneys experienced in class action

litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the Class or whose inclusion would otherwise be improper are excluded.

83. SUPERIORITY: A class action is superior to other available methods of adjudication because individual litigation of the claims of all Class Members is impracticable and inefficient. Even if every Class Member could afford individual litigation, the court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed. Individualized litigation also presents a potential for inconsistent or contradictory judgments.

## VIII. FIRST CAUSE OF ACTION

### Violations of Cal. Penal Code § 631

### By Plaintiff and the Class Members Against Defendant

84. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

85. Plaintiff brings this cause of action on behalf of herself and the Class.

86. California Penal Code § 631(a) prohibits any person from willfully and without the consent of all parties to the communication reading, or attempting to read, or learning the contents or meaning of any message, report, or communication while the same is in transit, and from using or attempting to use, in any manner or for any purpose, any information so obtained. The same subdivision separately reaches any person "who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section."

87. The page addresses, the page titles identifying the subject matter of the pages Plaintiff and Class members were reading, and the words appearing on the links they selected, all transmitted in named payload fields, constitute the "contents" of those communications within the meaning of § 631(a). As described in the preceding tracker-specific allegations, Defendant caused the page addresses to be duplicated and routed over separate channels to both Mixpanel and LinkedIn, and caused the page titles and link text additionally to be routed to Mixpanel, at the endpoints identified above, and

each recipient acquired the contents it received while the same communication was in transit.

88. Defendant intentionally configured the Website to transmit Plaintiff's and Class members' page addresses to both Trackers, and their page titles and link text additionally to Mixpanel, as set out above, and permitted the Third Parties to use that information for the identification, attribution, matching, tallying and advertising functions alleged above. The Third Parties are not parties to the communications between Plaintiff and the Website. Plaintiff and Class members did not consent to interception of the contents of their communications by any Tracker, and no other exception to § 631(a) applies. Defendant is independently liable under the aiding provision of § 631(a). Defendant selected each Tracker, obtained an account for it, embedded its code on the Website, configured that code to execute automatically on page load, and caused Plaintiff's own browser to carry out each transmission. In doing so Defendant aided, agreed with, employed and permitted each Third Party to do the acts prohibited by § 631(a), and permitted and caused those acts to be done.

89. Section 631(a) reaches not only reading the contents of a communication but learning its contents or meaning. Attributing a described page to an identifier that recognizes a visitor across sessions, and matching a visitor to a member account in order to tally her actions on named pages, are each operations performed on what she transmitted, and neither can be performed without ascertaining what the transmitted values say.

90. Each interception constitutes a separate violation of § 631(a). Plaintiff and the Class are entitled to recover the greater of actual damages or $5,000 per violation pursuant to Cal. Penal Code § 637.2(a)(1), injunctive relief, and such other relief as the Court deems just and proper.

/ / /

/ / /

## IX. SECOND CAUSE OF ACTION

### Violations of 18 U.S.C. § 2511(1)(a)

### By Plaintiff and the Class Members Against Defendant

91. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

92. Plaintiff brings this cause of action on behalf of herself and the Class.

93. 18 U.S.C. § 2511(1)(a) reaches any person who "intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication." The Federal Wiretap Act defines "contents" to include any information concerning the substance, purport, or meaning of a communication. 18 U.S.C. § 2510(8).

94. The page addresses, the page titles, and the words appearing on the links Plaintiff and Class members selected are "contents" of electronic communications within the meaning of 18 U.S.C. § 2510(8), because they communicate the substance, purport and meaning of what Plaintiff and Class members were reading. As described in the preceding tracker-specific allegations, Defendant caused the page addresses to be duplicated and routed over separate channels to both Mixpanel and LinkedIn, and caused the page titles and link text additionally to be routed to Mixpanel, at the endpoints identified above, and each recipient acquired the contents it received while the same communication was in transit.

95. Defendant intentionally configured the Website to transmit Plaintiff's and Class members' page addresses to both Trackers, and their page titles and link text additionally to Mixpanel, as set out above, and permitted the Third Parties to use that information for the functions alleged above. Defendant thereby intercepted those communications and, independently, procured each Third Party to intercept them, by selecting each Tracker, obtaining an account for it, embedding and configuring its code on the Website, and causing Plaintiff's own browser to execute that code and transmit the contents. The Third Parties are not parties to the communications between Plaintiff

and the Website. Plaintiff and Class members did not consent to this interception, and no other exception applies.

96. Plaintiff and the Class are entitled to relief under 18 U.S.C. § 2520, including the greater of the sum of actual damages suffered by Plaintiff and the Class and any profits made by Defendant as a result of the violation, or statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000, together with punitive damages, reasonable attorney's fees, and other litigation costs reasonably incurred.

## X. <u>THIRD CAUSE OF ACTION</u>

### Violations of Business & Professions Code § 17200

### By Plaintiff and the Class Members Against Defendant

97. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

98. Plaintiff brings this cause of action on behalf of herself and the Class.

99. California Business and Professions Code § 17200 prohibits any unlawful, unfair, or fraudulent business act or practice. Defendant's conduct constitutes an unlawful, an unfair, and a fraudulent business practice.

100. Defendant's conduct is unlawful. By facilitating the interception of the contents of Plaintiff's and Class members' electronic communications without consent, Defendant violated California Penal Code § 631(a) and 18 U.S.C. § 2511(1)(a). Each statutory violation constitutes a predicate unlawful business act or practice under § 17200.

101. Defendant's conduct is also unfair. Defendant covertly transmitted Plaintiff's and Class members' URL contents to two third-party Trackers, and the titles of the pages they read and the words on the links they selected to one of them, for its own analytics and advertising purposes, contrary to its own representations to visitors and without authorization or compensation. The harm to Plaintiff and the Class including but not limited to the interception and commercial exploitation of personal information

and the financial value thereof is substantial, is not outweighed by any legitimate countervailing benefit, and could not reasonably have been avoided by Plaintiff or Class members.

102. Defendant's conduct is also fraudulent. Defendant represented to visitors that it does not share personal information for cross-context behavioral advertising while causing the addresses of the pages those visitors were reading to be transmitted to an advertising company under Defendant's own advertising account. That representation was likely to deceive a reasonable consumer.

103. Plaintiff and Class members suffered injury in fact and lost money or property as a result of Defendant's conduct. Browsing data identifying the specific content a user views, including browsing URLs and page titles of the kind intercepted here, has recognized and quantifiable economic value in the digital advertising marketplace. The Trackers are designed to use, and on information and belief did use, the intercepted content for the identification, attribution, matching, tallying and advertising functions alleged above.

104. Defendant appropriated that value for its own purposes without accurate disclosure, without consent, and without compensation. Defendant obtained the benefit of Plaintiff's and Class members' browsing data in the form of the analytics and advertising capabilities described above, including the ability to identify the visitors to its Website, to learn what they were reading about, and to direct advertising for its own products to them. Plaintiff and Class members were thereby deprived of the economic value of their data and of the full value of a privacy-protective browsing experience they reasonably expected and would have bargained for had the practice been disclosed.

105. Plaintiff and the Class are entitled to injunctive relief prohibiting Defendant from continuing its unlawful, unfair and fraudulent practices, restitution of monies acquired by Defendant through those practices, and reasonable attorney's fees pursuant to California Code of Civil Procedure § 1021.5.

/ / /

## XI. FOURTH CAUSE OF ACTION

### Violation of the California Constitution, Article I, Section 1

### By Plaintiff and the Class Members Against Defendant

106. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

107. Plaintiff brings this cause of action on behalf of herself and the Class.

108. Article I, Section 1 of the California Constitution provides that privacy is among the inalienable rights of all people in California. To state a claim for violation of the constitutional right to privacy, a plaintiff must establish: (1) a legally protected privacy interest; (2) a reasonable expectation of privacy in the circumstances; and (3) conduct by the defendant constituting a serious invasion of privacy.

109. Plaintiff and Class Members have a legally protected privacy interest in the contents of their electronic communications with the Website, including the specific page addresses and page titles reflecting their browsing activity. California law recognizes a legally protected privacy interest in personal browsing activity, particularly when that activity is covertly intercepted by commercial third parties for analytics and advertising purposes without disclosure or consent. The Legislature has separately recognized the privacy interest in a consumer's dealings with a financial institution, and has built a protective regime around it in the California Financial Information Privacy Act, Cal. Fin. Code § 4050 et seq.

110. Plaintiff and Class Members had a reasonable expectation of privacy in the contents of their electronic communications with the Website. A reasonable person visiting a bank's website to read about retirement accounts, health savings accounts and personal savings does not expect that the specific pages she browses, and the descriptions of those pages identifying the financial subjects she is considering, will be covertly transmitted to separate commercial companies, linked to persistent identifiers that recognize her browser across sessions, and used for analytics and advertising purposes. That expectation was reinforced here by Defendant's own published notice, which told

visitors that Defendant does not share personal information for advertising directed across contexts.

111. Defendant's conduct constitutes a serious invasion of that privacy. By embedding and configuring the third-party tracking technologies described above on the Website, Defendant caused the covert transmission to two third parties, in named fields of their own requests, of the addresses identifying the specific financial subject matter Plaintiff and Class Members were reading about, and caused the titles of those pages and the words appearing on the links they selected to be transmitted to one of them, each attributed to a persistent identifier. Measured against community norms rather than against any characteristic particular to Plaintiff, that conduct constitutes an egregious breach of social norms.

112. As a result of Defendant's invasion of their privacy, Plaintiff and Class Members have suffered harm, including loss of privacy, loss of control over their personal information, and the unauthorized commercial exploitation of their browsing activity. Plaintiff and the Class seek injunctive relief, nominal damages, and all other relief authorized by law.

## XII. <u>FIFTH CAUSE OF ACTION</u>

### Intrusion Upon Seclusion

### By Plaintiff and the Class Members Against Defendant

113. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

114. Plaintiff brings this cause of action on behalf of herself and the Class.

115. The common law tort of intrusion upon seclusion requires: (1) an intentional intrusion, physically or otherwise, into a place, conversation, or matter in which the plaintiff has a reasonable expectation of privacy; and (2) that the intrusion would be highly offensive to a reasonable person.

116. Defendant intentionally intruded into Plaintiff's and Class Members' electronic communications with the Website by deliberately embedding third-party

tracking technologies that intercepted the URL contents of those communications and transmitted them to two third parties, and that intercepted the page titles and the words appearing on the links they selected and transmitted those to one of them. Defendant did so without Plaintiff's knowledge or consent. Plaintiff had a reasonable expectation of privacy in the contents of those communications.

117. The intrusion is highly offensive to a reasonable person. The pages identified above are descriptive on their face, and the addresses and titles transmitted identify the specific financial subject matter each visitor was reading about, including individual retirement accounts, health savings accounts and personal savings. Defendant covertly caused the addresses of those pages to be transmitted to two separate commercial companies, and caused the titles of those pages and the words appearing on the links the visitor selected to be transmitted to one of them, attributing all of it to persistent identifiers assigned to the visitor's browser. A reasonable person would find the covert transmission of the specific financial subject matter of her own reading to commercial companies, together with its description in words, without prior notice, without any opportunity to prevent it before it occurred, and contrary to Defendant's own published representations, highly offensive. The offensiveness is measured objectively and does not depend on any characteristic particular to Plaintiff.

118. As a result of Defendant's intrusion upon their seclusion, Plaintiff and Class Members have suffered harm, including loss of privacy, emotional distress, and the unauthorized exploitation of their personal information. Plaintiff and the Class seek compensatory damages, nominal damages, injunctive relief, and all other appropriate relief.

## XIII. SIXTH CAUSE OF ACTION

### Restitution and Quasi-Contract (Unjust Enrichment)

### By Plaintiff and the Class Members Against Defendant

119. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

120. Plaintiff brings this cause of action on behalf of herself and the Class.

121. Unjust enrichment requires: (1) a benefit conferred on the defendant; (2) at the expense of the plaintiff; and (3) circumstances that make it inequitable for the defendant to retain the benefit without compensating the plaintiff.

122. Defendant received a benefit from the conduct alleged above. Defendant deployed the Trackers under its own accounts in order to identify the visitors to its Website, to learn what those visitors were reading about, and to build and direct advertising for its own banking products to them. The contents of Plaintiff's and Class Members' communications with the Website were the input that made those capabilities available to Defendant, and Defendant obtained them without paying Plaintiff or Class Members anything.

123. Defendant received this benefit at Plaintiff's and Class Members' expense. Plaintiff's and Class Members' browsing data constitutes personal property with recognized economic value in the digital advertising marketplace. By causing the URL contents of Plaintiff's communications to be transmitted to two third parties, and the page titles and link text to one of them, all under Defendant's own accounts, Defendant obtained the commercial value of that data without compensation. Plaintiff and Class Members also suffered the loss of control over their personal information, which has recognized economic value as a privacy-protective property interest.

124. It is inequitable for Defendant to retain those benefits without compensating Plaintiff and Class Members whose browsing activity was the source of that commercial value. Defendant's concealment of the tracking arrangement and its failure to obtain Plaintiff's and Class Members' informed consent render retention of those benefits unjust.

125. Plaintiff and the Class seek restitution of the benefits Defendant obtained from the interception and commercial exploitation of Plaintiff's and Class Members' own communications, measured by the value Defendant realized from those communications and not by any broader measure of Defendant's revenues. Plaintiff

pleads this claim in the alternative. Plaintiff lacks an adequate remedy at law as to the relief sought here, because the statutory damages available under Cal. Penal Code § 637.2 and 18 U.S.C. § 2520 are fixed sums that neither reach nor are measured by the benefits Defendant obtained from the ongoing commercial exploitation of Class Members' intercepted communications, and because restitution of those benefits is measured by Defendant's gain rather than by Plaintiff's loss.

## XIV. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following:

1. An order certifying the Class, naming Plaintiff as Class representative, and naming Plaintiff's attorneys as Class counsel;
2. An order declaring that Defendant's conduct violates Cal. Penal Code § 631(a), 18 U.S.C. § 2511(1)(a), Cal. Bus. & Prof. Code § 17200, et seq., Article I, Section 1 of the California Constitution, and the common law prohibition against intrusion upon seclusion;
3. An order enjoining Defendant from continuing the conduct alleged herein;
4. Statutory damages pursuant to Cal. Penal Code § 637.2(a)(1) of $5,000 per violation;
5. Statutory damages pursuant to 18 U.S.C. § 2520 of the greater of the sum of actual damages and any profits made by Defendant as a result of the violation, or whichever is the greater of $100 a day for each day of violation or $10,000;
6. Punitive damages pursuant to 18 U.S.C. § 2520;
7. Restitution pursuant to Cal. Bus. & Prof. Code § 17200, et seq.;
8. Nominal damages and injunctive relief for violation of Article I, Section 1 of the California Constitution;
9. Compensatory and nominal damages for intrusion upon seclusion;
10. Restitution of the benefits by which Defendant was unjustly enriched at

Plaintiff's and Class Members' expense;

11. Prejudgment interest;

12. Reasonable attorney's fees and costs; and

13. Such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all causes of action and issues so triable.

Respectfully submitted,

Dated: September 4, 2026 **LAW OFFICES OF ROSS CORNELL, APC**

By: *<u>/s/ Ross C. Cornell</u>*
Ross Cornell, Esq. (SBN 210413)
P.O. Box 1989 #305
Big Bear Lake, CA 92315
Office: (562) 612-1708
Email: rc@rosscornelllaw.com

**NATHAN & ASSOCIATES, APC**
Reuben D. Nathan
2901 W. Coast Hwy., Suite 200
Newport Beach, CA 92663
Office: (949) 270-2798
Email: rnathan@nathanlawpractice.com

*Attorneys for Plaintiff and the Putative Class*